McChesney, Kline's father, and Bramble. And we have for appellants, for Mr. Arnell, John Baylis. Yes, thank you. And for B. McChesney, Darla Mondo. And for M. McChesney, Mark Parker. Mike, I'm sorry. Oh, I see. Okay. For Mike, yeah, I think I just said M. For Mike McChesney. And for Mr. Kline's father, J. Lansing. And for Mr. Bramble, Palmer Ustal. And that's me, Your Honor. Okay. Do the appellants have any agreement on dividing time? Yes, we do, Your Honor. We are going to use four minutes apiece. Very precise. Okay. And for that reason, I'm going to cut straight to the chase. We'll start the time. Okay. If we need a little, we can't go way over, but if anybody needs like 20 seconds extra, we'll definitely give them 20 seconds. Okay. I'm going to cut straight to the chase then, Your Honor, and I'm going to talk about the cross-examination issue and whether we should be able to, that is, defense counsel should be able to delve into punishment of cooperating witnesses during cross-examination. In every single drug case that I have done, at least every drug case that I have done, I have found that the best way to test doubt on the credibility of these witnesses is take out their plea agreements, which invariably have benefits that have been conferred on these witnesses by the government in the form of 5K1.1 motions and Rule 35 motions. And we talk about, you know, how they can earn this benefit, which is a reduction in sentencing, by cooperating with the government and providing substantial assistance against our clients. Don't we have some cases that say that you're not allowed to show or it's in the discretion of the trial judge to show the difference between the maximum available and what they bargained for because that might prejudice the jury with respect to the defendants on trial? There are cases that say that, Your Honor, but I think that in this, I think, and that's what I'm going to try to do is tell you why we should be able to. Don't tell us why we should overrule those cases because we can't. No. Just tell us how we can distinguish those cases. We should be able to do that. In this case, we have the Schoenberg case, which Judge Kleinfeld wrote, and he indicated that the defendant in these situations should be able to show the benefit conferred and the detriment avoided. And it's our position, if that's the case in the Ninth Circuit, that allows us to delve into the scope of the benefit conferred and the scope of the detriment avoided. And that case name again was? Schoenberg. Schoenberg. And that's cited. That's the status of the law in the Ninth Circuit. Now, I think that with respect to the question that the court, Your Honor, was asking just a little bit ago, that the cases talk about whether the jail time that these witnesses could have faced but for their cooperation is marginally relevant or whether it was necessary or not necessary in order for the defendants to elicit those biases from the witnesses and whether they could make a discriminating appraisal. The problem is that once we have cross-examined this witness on the stand and elicited that evidence from that witness, the witness ends up saying, well, I've seen the light, and now I'm honest. And I'll point the court to a specific location in the record, which is page 882 of the trial transcript, and this is the testimony of Mario Rieta. He says, the question is posed, and you're doing this, you're just doing this as a good citizen. His answer is, I'm doing this because it's the right thing to do. Two pages later, and, of course, in the meantime, they're talking about this benefit conferred. But you certainly weren't kept from saying, look, you've got a plea. You've got a plea agreement. You're getting favorable treatment. You're, you know, you're getting less of a sentence. Isn't that made apparent to the jury, even though maybe not how many years lasts? Well, I think that's the critical importance. Here, I'll point the court to another page. It's 884. He says, I'm here. They asked me to be honest. I'm being honest. But you're arguing that we should overrule our prior cases, and I tell you we can't do that. So tell me why this case is different from those cases. And that's what I'm doing. The prosecutor then takes the plea agreement, and he says, you agreed to be truthful. And he says, yes. And he says, are you being truthful? And he says, yes. Now, the point, the distinguishing point is whether it's necessary for defense counsel to show the price of that testimony. I mean, recent dealings with Jack Abramoff and all of those things that are going on shows that everybody has a price. And here we have a witness, and we have a number of witnesses who are testifying. That's so in all these cases. I mean, it's the same thing as cross-examining a doctor. You're being paid for your time, are you, doctor? How much are you being paid? Objection. That's irrelevant. Well, maybe it is relevant to show that he's getting paid $1,000 an hour instead of $250 an hour. And maybe we allow that in civil cases. But in criminal cases, in this circuit, there are cases which say as long as you can show that there is a deal, that he's getting favorable treatment, you're not allowed to show the price for testimony, as you put it. Now, why is this case different? Because where we are in this day and age, we have mandatory minimum sentencing. Okay? And courts, even though there's a jury instruction that says that courts, that the punishment is within the province of the court, not within the province of the jury, oftentimes don't have the ability to determine what the price is. It's the government. It's the prosecutor. And so, in this case, it's the court that is doing the best job of determining what the price is, and that's what we're trying to do here, simply by virtue of his  All right. I'm giving you three chances. That's it. I'm not going to ask the other questions. Okay. We're past four minutes, but we'll give your colleagues some extra time. I knew I was going to get in trouble presiding in this one. I'll just say it's very difficult in a conspiracy case. Each defendant really has a — each counsel represents a different defendant. And, you know, if somebody needs more than four minutes, we'll let you have it, and we'll add some time for Mr. Sigdalson. Sigdalson. Sigdalson. So, go for it. Thank you, Your Honor. John Ballas on behalf of Sean Arnell. The argument that Mr. Hooverstall just made applies to a number of defendants, including myself. In my case, it applies even more significantly with me, because the only evidence against my client was from the three cooperating — three cooperators, Mr. Rieta, Mr. Wacholtz, and Mr. Spencer. I want to talk about a different issue, but before I do, I did want to address Judge Abia's comments. I don't think that this — the law on this Court says that we're not allowed to ask about it. No. If that's what I said, I misstated myself. The law of this circuit, as I understand it, is that it's a discretionary call by the trial judge. Well, I'm — And if he doesn't allow the exact difference between possible and actual sentences to the cooperating witnesses, he has discretion to do that. I think — I think the law is — and the only case that I know of that the government cited was the Daddian case, and it talks about, in that case, where there was a lot of other extensive cross-examination into the plea agreement, it wasn't an abuse of discretion not to allow cross-examination at the patent. That's the one I had in mind, Daddian. Right. But in this case, the reason that's distinguishable is that the only thing the jury learned was that they got some generalized benefit by either two of the defendants not being charged or the third defendant, there was some potential reduction in the sentence. But that's not really significant or substantial to be able to allow the attorneys to be able to argue in the closing of the significant benefit they get. In our district, it's common that we're allowed to talk about what the penalties are in a plea agreement and the amount of reduction. And then the judge instructs the jury in the closing, when they do the instructions, that you're not to consider a penalty. And we cannot argue in closing in terms of penalty with respect to our client. So your distinction with Daddian was, in Daddian, there was much more testimony regarding the potential benefits to the cooperating witnesses than was allowed here. Yes. What was allowed there that wasn't allowed here? It's a kind of a short opinion, so it doesn't – it says that there's extensive cross-examination into the plea agreement. The other distinguishing factor – What was left out in your cross-examination other than the specific term that they could have gotten and what they did get? Well, for example, with Mr. Rieta, there was no availability to say that there was a 50 percent sentencing reduction that could be obtained after his testimony at the time of sentencing. The other distinguishing factor is that in that case, and the Court points out, that the cooperating defendants admitted that they committed perjury and lied. So in that case, the additional cross-examination that they wanted to get into may not have been that substantial and made a difference because you already had them agreeing that they committed perjury. I want to switch. The other issue I want to talk about in the couple minutes I have left is with respect to Sean Arnell, why he did not deserve a three-level major role enhancement. In fact, I think there's a very good argument he should have gotten a minor role or, you know, arguably maybe no role, but there was no evidence he should have gotten a major role reduction. The case law in this circuit says that to get a managerial role, a supervisor role, there has to be some evidence in the record that you supervise or exercise control over other people. Okay. What if you helped to organize a distribution system? Well, that didn't even really happen here. The only extent you could argue that he organized is what happened was this is the way the evidence came out. Mr. Arnell was hooking up cable for Mr. Rieta. Mr. Wachholz, an old friend from Montana, came with him. While they were together, Mr. Wachholz asked Mr. Rieta if he could get drugs, what the quantities were, what the prices were. They discussed it among themselves. Mr. Arnell was present, and then later on he helped facilitate putting the two of them together where Mr. Wachholz had spent, who would send the money, and he would get the drugs from Mr. Rieta and then put the two together. But there was no organization, no organization in any general sense, and no organization. The cases talk about organization in the sense of organizational authority. After a while, Rieta sold direct to Wachholz, but at first he wouldn't sell to Wachholz. He had to sell through Arnell because he knew Arnell. Right. So why isn't that a role of organizing similar to managerial and supervisorial? Because he doesn't have any control. He didn't really do any organization other than get direction from Mr. Rieta and Mr. Wachholz. Did he pick up any debt accounts from the buyers? He picked up money. They sent him money. I mean, there were a group of, I don't remember, in some of these cases, there was a balance outstanding owed to Rieta by one, and it was taken over by another. No. That was way later with other defendants. That didn't involve Arnell. Right. There was no organizational authority over others. That's what the case law requires, no supervision, no management, no control over others. We'd better get to the close of your segment. Yes. Thank you. Thank you. Good morning, Your Honors. Please report. Let me just clarify. We have three more counsel left. Right.  So. Attorney Darla Mondo. I don't want to feel guilty here. Add six minutes to the appellant's argument, and that will give you enough time for the remaining three. Okay. I represent. If the government needs more time, we'll deal with that. Okay. I represent Ben McChesney in this matter, and my issues are a little bit more confined because the evidence showed at trial that none of the major players knew Ben McChesney except Spencer. And it's my position that the evidence was insufficient for the jury to find that Ben McChesney was a member of the conspiracy and that the judge should have granted his Rule 29 motion. This is all based on fact. The only member of the conspiracy that even mentioned Ben was Spencer, and when Spencer did mention him, he mentioned that he had provided Ben with four ounces of methamphetamine. However, on cross-examination, he reduced that to an ounce and a half, and this, according to Spencer, was sometime in the summer of 2001, maybe up to September. We know it couldn't have been after September because by then Spencer was arrested and in jail. So we have one witness, not Rieta, not Wachholz, not Arnell, not Kine's father, and I'll get to that in a minute, but nobody mentioned Ben McChesney except Spencer. Well, but Spencer took over for Wachholz and took the debt that Wachholz owed Rieta, so he was a player. I mean, he was a seller to the distributors in Montana, right? Spencer. Spencer was. Yes. And the distributors in Montana included Ben McChesney. Yes. According to Spencer, he distributed or provided him with an ounce and a half. All right. Then the government used two other witnesses to try to rein in Ben into this conspiracy, and that was Vandersloop and a female, Fawn Thompson. Thompson couldn't even remember what year she got some drugs from Ben, so there was absolutely no proof whatsoever that that was methamphetamine from this conspiracy. Vandersloop testified that he got two ounces of methamphetamine from Ben in September of 2001, and he believed he got from Mike McChesney. So out of the three witnesses, Spencer, Vandersloop, and Thompson, only one of them, Spencer, testified that he gave Ben the drugs. Thompson didn't know where the drugs came from, and Vandersloop said they came from Mike McChesney. Now, how did the jury go from finding Ben not guilty on every single one of the substantive counts and even every one of the allegations that were in count one, the conspiracy? If you match the allegations in count one up with the substantive counts that he was acquitted of, yet find him guilty of count 13, which alleges that – doesn't even name him – which alleges that in October or early November, he either – What year? October, early November of what year? 2001. By this time, Spencer is in jail. Spencer is still the only major player in that conspiracy that even mentioned Ben. Brietta didn't know Ben. Washels didn't know Ben. But in – on count 13, which Ben McChesney is not named, the jury found him guilty of in late October or early November 2001, knowingly and unlawfully possessing with intent to distribute or aiding and abetting. Well, there's a real problem with that. Not only the fact that he wasn't named, because under Pinkerton theory, he could be liable for that, but they're alleging that in October or November of 2001, he took possession or aided and abetted. Yet the only witnesses that testified against him, Spencer was already in jail. Vandersloot said it was in September of 2001. So that couldn't be part of the same methamphetamine, not the October batch or November batch. And Thompson didn't even know when it was. So the jury could only have attributed count 13 to Ben through some other evidence, because there was none that put him getting this in October. Getting it? Assisting it? Even selling any of it. That was all prior to this. What about the evidence that Spencer sold him one-and-a-half to four ounces of methamphetamine in the summer of 2001? One-and-a-half ounces. Right. But on direct for and on cause examined, one-and-a-half, right? Okay. Right. But this is alleging in October or November of 2001. So that would have been after he would have possessed that. And it's a legend. You think the methamphetamine doesn't have that long a shelf life? Well, I'm saying they're saying 14 pounds. It says in October or November. But yet the methamphetamine he got from Spencer was in the summer of 2001. And that is when he sold some to van der Voort. But how could the jury have gone from the testimony that they heard from Spencer and the two other witnesses to finding that Ben participated? We'd best leave some time for your colleagues, if we can. Thank you. May it please the Court, my name is Mark Parker here for Mike McChesney. The principal flaw in this case is that none of the defendants, and especially Mike McChesney for who I speak for, was ever charged with trafficking in methamphetamine, and the entire case was about trafficking in methamphetamine. The charges were possessing with intent to traffic, which is a different creature than trafficking or distributing in its entirety. It's as different as saying two partners in the business of raising cattle are somehow co-conspirators with all those that are in the marketplace marketing cattle. It's completely different, and the two concepts have been mixed and matched this entire trial over my strenuous objection. There was never an agreement by my client to sit around and possess any of the methamphetamine that he is accused of possessing or conspiring to possess. Never. We know he was never in California, that it was assembled in California, it was packaged in California. He was no part of it, ever. We know that he was not part of the transportation of it to Montana, and the large hunks of methamphetamine that were possessed I'm not talking about trafficking. If they wanted to charge trafficking, they could have. They didn't. They charged possessing with intent to distribute. My client, as a matter of logic, and the brief explains it, could never have aided and abetted that possession because it occurred prior to any of his involvement. He couldn't have conspired to do it because it occurred without his knowledge well after his participation in allegedly receiving some for further distribution, and he clearly was never a principal in all of this. So the case is organically bad from the very beginning, and that point is pervasive, and it should cause the entire matter to be thrown out. The only other issue I want to argue, and it's the one that I am obsessed with, and thank you for listening at least 30 seconds to it, is that Pinkerton is wholly unconstitutional. It is the only way. How can we make a ruling that the Pinkerton precedent, which I thought was from the Supreme Court, is unconstitutional? It's not from the Supreme Court. That fiction is pounded by the government. Pinkerton, the theory that we now are faced with, and that is that you can substitute the concept of foreseeability with intent, is a creature totally of the statutes. The Pinkerton case says that bootlegger brother A is responsible for the conduct of bootlegger brother B. This case says because the precise crime was contemplated. That's what the Pinkerton case says. The Supreme Court has never gone back and said that in a case where there is something other than the precise crime contemplated, that you can still get a conviction on just the bare concept of foreseeability. The Pinkerton case did say if we have a case where the crime was not foreseeable, it might be a different creature, but it never said that pure foreseeability, as opposed to contemplating the precise crime, would ever pass constitutional muster. It was dicta, and it never was addressed. This substituting foreseeability, it's the only way the United States government can put people in jail without taking a crime book off the shelf that Congress has set forth the elements of and proving it. It is purely a way to put people in jail, bypassing Congress and bypassing the President. There is not a statute anywhere that says that you go to jail because you've joined a conspiracy, and then as a foreseeable consequence, another crime is committed. In fact, both the conspiracy statutes which we usually battle with, 371 and 846, both of those say the exact opposite. They say if you commit the conspiracy, you can go to jail for, with 371, five years, for the drug conspiracies, for the length of time that the object of the conspiracy that you were contemplating would have for time. None of them say that you can then also go to jail for crimes committed in furtherance of the conspiracy. The only people that have ever said that are circuit court judges, and that's what I'm here to complain about. You've got to quit it. You've got to stop it. And that's what I'm asking, and that is I've drilled the bedrock on this issue. I've hired a clerk to drill the bedrock, and bless your hearts for putting up with my tantrum on the issue. We will certainly study it. Okay. We appreciate the argument. If it pleases the Court, my name is Jay Lansing. I am appearing on behalf of Wesley Kinn's father. Wesley is the only defendant out of the five of us who pled guilty, and he appeals his sentence as to count one of 235 months, which when combined with the firearm offense resulted in him being sentenced to 295 months. The primary issue in regard to Wesley is whether or not he should have received a two-level increase for being a manager or supervisor of others. That is a difference of 67 months for Wesley. Wesley was sentenced about 60 days before the first Ameline decision, and in this particular case, we strenuously objected to the three-level increase. Wesley did not admit to being a manager or supervisor of anyone. That enhancement was not found by a jury, and that, as we know under Howard, shifts the burden to the government to satisfy its burden to present evidence in support of that enhancement. In this particular case, the government, we also know from Ameline, that it cannot rely on the PSR to meet that burden in establishing the factual basis for the enhancement, and that is exactly what happened in this case, which meant a difference of 67 months for Wesley. The only person that Wesley was to have supervised was a fellow by the name of Michael Boathman, and Mr. Boathman was never called as a witness at the trial. I would also note that Wesley was only there for about the first, I want to say we were there for the first two-and-a-half days of the trial. Didn't Mr. Kinn's father assume Mr. Spencer's debt to Mr. Rieta? He was made to assume the debt owed to Mr. Rieta, because Mr. Rieta made sure that somebody was going to pay him back, and, Judge, just for whatever it's worth. And that also, since he showed his good faith and assumed the debt, then he was allowed to keep trafficking with Mr. Rieta, right? And that's when he sent Boathman to pick up the 14 pounds of methamphetamine from Rieta. He didn't. Judge, I would disagree that he sent Mr. Boathman to go pick up the 14 pounds. I realize, I mean, I would tell you what is in his statement, and I'm talking about Wesley's statement, is he said, I made arrangements for Mr. Boathman to go out to California, because he had already been out to California before, and Mr. Boathman, my understanding was, is that his mother was living out in California, and so Mr. Boathman happened to be going out there and went out and delivered some money and picked up some drugs. But to simply say that he assumed the position of Mr. Spencer, I understand that there's that urge to say, well, then he's supervising others. The problem is, is I don't know of one single person above us, and I'm talking about Mr. Wachholz, Mr. Spencer, or Mr. Rieta, that ever got an aggravating role. And if ever somebody deserved an aggravating role, it was Mr. Rieta. And he ends up with 118 months. Well, he turned over. That's fine, Judge. You know, that's perfectly his right. But the problem is, is that that doesn't change the fact that if he was anything, he was the manager, organizer, leader, or supervisor of this entire matter. And in this case, when we look at Mr. Kinsfather's role, he never supervised anyone. He was, as I called it in my brief, the reliable lackey. So are you arguing for full resentencing for Kinsfather or an amyline limited? What I'm asking for is a resentencing of Mr. Kinsfather without the three-level enhancement. I take it we can't do that for you. We'd have to send it back to the district court. I understand that, Judge. So what you want is a full resentencing hearing, not just an amyline limited, to see if the court would have given a different one if the guidelines were advisory. Correct, Judge. Because I think that the record shows, at least from the comments made by Judge Siebel, that he had some question about sentencing Mr. Kinsfather to the 235 months, which was the low end of the guideline range. Thank you. Thank you very much. Okay. Mr. Singdolson. I'm sorry, Ken, but I've got my sheet too far away. Singdolson. Excuse me. Singdolson, your honor. Singdolson. All right. So I'll remember that. By the way, I should say we appreciate all the Montana Council traveling to see us here and also the Government's Council traveling. You maybe get the award for the person who came the farthest, except for Judge Bea, who was also in D.C. So you share that award. All right. Why don't you go ahead. We added time to your colleagues' arguments. If you need more than your 20 minutes, we'll add some time to yours. Thank you, Your Honor. May it please the Court, I am Jeff Singdolson, Counsel for the United States in this matter. I'd like to begin by addressing Benjamin McChesney's contentions with regard to the evidence in support of the conviction on conspiracy. As articulated in the Government's brief, there were, in fact, three witnesses who discussed Benjamin McChesney's distribution of methamphetamine that was conspiracy methamphetamine. Fawn Thompson, who was mentioned, discussed purchasing methamphetamine from Benjamin McChesney, and she testified in connection with that, that the methamphetamine that she purchased from Ben McChesney was the waffle type with the nasty taste, the same that she had purchased from Tony Havener. There is the testimony at trial was replete, and this is referenced in our brief, with reference to the unique waffle nature. That came from Rieta. From Rieta, yes, sir, of the methamphetamine from Rieta. And Tony Havener was also one of the co-conspirators, and there was considerable testimony at trial about his receipt of methamphetamine from Spencer, and I believe Wackel as well, but at least Spencer. In addition, that sort of led to a fair inference by the jury that this was conspiracy methamphetamine, and that inference was, in fact, nailed down in concrete by Spencer's testimony, that Benjamin McChesney had middled a sale from Spencer to Benjamin McChesney to Fawn Thompson. So not only did the court have as to the jury have as to this, Fawn Thompson's own testimony allowing it to infer that this was conspiracy methamphetamine. It had Spencer's testimony. Kennedy. Well, if somebody walks off the street and buys from the conspiracy and then resells it, does that make them a conspiracer in the large conspiracy? I mean, how much more do you have against Benjamin McChesney than that? We have the transactions at issue, Your Honor, that are talked about. And Spencer's testimony, and understanding that you have to, in reviewing the jury, have to infer all reasonable inferences and view the evidence in favor, was at least 4 ounces, and that he testified to transactions spanning a period of time, including midsummer 2001. He also testified that he had distributed methamphetamine from to Benjamin McChesney as early as January 15th. And you think that Ben McChesney's welfare depends on the success of Rieda's dealings? Well, Your Honor, in addition, as is in our brief, he was fronted methamphetamine by Spencer. He niddled a deal, both of which are significant evidence of actual membership in the conspiracy. He also, in his dealings with VanderSloot, made clear that he understood Michael McChesney, that VanderSloot was a customer of Mike McChesney. He understood Michael McChesney's pricing. In addition, there was testimony about an attempt that he and Hodges, another co-conspirator, were engaged in to go rob Spencer as Spencer was taking money back to California to pick up more to pay off fronted methamphetamine and to pick up more. We submit, Your Honor, that all of this suggests that he had a general understanding of the scope of the conspiracy, and there are numerous cases from this Court that have held that where a defendant or a drug distributor understands the general scope of the conspiracy, he understands that his success as a distributor is dependent on the overall success of the distribution network as a whole. Kennedy. Counsel, could you give me a page cite on any evidence that Ben McChesney bought on credit from Spencer? I seem to have missed that one. It is in our brief, Your Honor, but let me see if I actually have the cite in front of me. I see that he bought four answers from Spencer. Yes, Your Honor. The testimony from Spencer is, and I apologize, I'm having trouble putting my hands on the specific cite, although I can obviously provide that for Your Honor, is, and I do believe it's in our brief, is that Benjamin McChesney owed $600 to Spencer for methamphetamine at the time of Spencer's arrest in September. That's right. That's at 722-723. Yes. I assume that's correct, Your Honor. I don't have the cite. I apologize. So that's the evidence with regard to Benjamin McChesney. I also want to turn to the question of the cross-examination, and I just want to correct at least one specific aspect of that. The statement was made that there was no opportunity at the trial to introduce the fact that Rieta's plea agreement provided for a 50 percent reduction, up to a 50 percent reduction if he cooperated. I would submit, Your Honor, that that's actually not correct, and the transcript cites to that are 881 to 882, and then 905 to 06, in which there was specific discussion of pre-paragraph 3C of Rieta's plea agreement, and that was actually, I believe, put up on the screen for the jury to see, and that talked about specifically that if he cooperated, and counsel also went into what that meant, and who decided whether he cooperated, and that the motion would ultimately have to be done by the government within the full paragraph. Were they allowed to make the point that it's the government that decides whether he's telling the truth? Yes, sir. Repeatedly, throughout various witnesses, they made all those points, that the government decided whether the assistant was substantial enough and whether the witnesses were telling the truth. And then with regard to Kinn's father's sentencing, Your Honor, we filed a 28-J letter in response to essentially this Court's decision in Spielman, which had to do with whether or not the plea waiver, the appeal waiver in the plea agreement in this case, and the language is exactly the same, was a waiver of direct appeal or only collateral relief. In Spielman, this Court held that the language was ambiguous, and the Court, therefore, construed it against the government and held that it did not waive direct appeal. As the cases in our 28-J letter indicate, however, there's a three-step process for determining what language in a contested language in a plea agreement means. And the first is whether or not it's ambiguous. The second, which was simply not at issue in Spielman, was whether or not there was an understanding by the parties as to this language based on an objective examination. And if Your Honor's look at the plea colloquy, twice during the plea colloquy for Kinn's father, the Court noted that he was waiving his right to appeal. And that's at the sentencing transcript, pages 19 to 20, Kinn's father's excerpts of record, page 35. Kinn's father twice acknowledged that he understood that. At sentencing, the Court also related that defendant had waived his right to appeal, and counsel for the defendant acknowledged that that was correct. As a result, we believe that Your Honors do not need to get to the third step, which would be construing the ambiguity against the government. Kinn's father has waived his right to direct appeal, and therefore, this Court doesn't have jurisdiction over his sentence. Kennedy. Have you read our recent in-bank decision in Buckley v. Terhune, which imposes an objective theory of contract formation, regardless of this objective knowledge shown of the defendant? That's in the plea agreement. I have, Your Honor. And setting to the side that that's California State contract law initially, I think that what I'm saying is consistent with that. I'm not saying this turns on Kinn's father's subjective testimony as to what he believed, which was the issue in that case, that defendant's later testimony at a trial about what he understood. It instead has to do with the objective facts that the Court in the plea colloquy here specifically said that this relates to your appeal. And so that is, in this Court's cases, made clear that those are the type of objectives. The plea colloquy says not only do you understand that term, but do you accept it? It is, Your Honor, inherent. I mean, I don't know what the specific language is, but certainly inherent in the plea colloquy, the acceptance of the knowing and intelligent aspect of the plea, that he both understood it and accepted it. How does a plea waiver affect entitlement to or non-entitlement to an amyling remand? This Court has held that the plea waiver applies, so that the fact that there's intervening case law, namely Blakeley or Booker, that that doesn't get one out of the way, doesn't make the plea waiver less than knowing and voluntary. Unless Your Honors have questions on additional issues, there are obviously a lot of additional issues. I'll rest on the arguments made in our brief. My notes indicate you haven't talked about Mike McChesney. I'm sorry, Your Honor. Well, with regard to Michael McChesney's Pinkerton claim. Or, indeed, Arnell. Well, Your Honor. Well, let me come back to Arnell. With regard to Michael McChesney, I'll just tick those off quickly, Your Honor. With regard to the Pinkerton matter, first of all, we think it is Supreme Court, and this Court can't overrule the Supreme Court, obviously. Even if it's not, the defendant's argument is that it's the court of appeals, and particularly cites an en banc decision of this Court, that has, in his view, misconstrued Pinkerton and established an unconstitutional common law crime. But, Your Honors, I mean, we would submit that he's incorrect on the merits. But, in addition, this panel doesn't have the authority to rule contrary to other panels of this Court or the en banc decision. So I think he's essentially reserving the issue. Okay. How about the issue of Arnell as a supervisor? Your Honor, the defendant has argued that the case law establishes you have to have managerial control and authority over someone else. We do not believe that is what the case law provides. We believe that the case law provides that if you organize others, that that is and can be sufficient. Here, the evidence was that Wachholz went to Arnell and said, we would like to find somebody to provide us pound quantities of methamphetamine so we can take it back to Montana and distribute it. Arnell said, I think I know somebody. I'll go talk to him. And they said, yeah, go do that, find out what the prices are, and come back to us. He did that. He set up the relationship with Rieda. He was the only go-between with Rieda for the first four transactions at issue here. And we would submit, Your Honor, that that is sufficient organization, that the managerial enhancement reflects that one who organizes a group offense by recruiting or bringing together the elements necessary to carry out the group offense is more dangerous and is appropriately given a three-level enhancement. Your Honor, with regard to the other issue, with regard to Michael McChesney, I just think it's wrong as a matter of law to suggest, as I understand the argument to be, that possession with intent to distribute ends once Spencer hands to one other person. The intent to distribute here was to distribute this down the chain to get the money needed to pay off the front, to keep the supply going here. That was the conspiracy. It wasn't simply to hand it off to Michael McChesney. It was for Michael McChesney to sell it and give money back to Spencer and Wachholz, and who were fronting that to Michael McChesney, who needed the money to then pay Rieda. So I think it's incorrect to suggest that the relevant offense here ended with Michael McChesney, with bringing the methamphetamine into Montana. Thank you, Your Honor. Okay. Thank you. I'm going to permit a reply or a rebuttal. We're really going to limit it to 30 seconds to a minute for each of the five of you. Very briefly, Your Honor. Judge Bia, the distinguishing factors of the Dania case are that the witness in that case committed perjury. He lied to the FBI, and he falsified income tax returns. For that reason, the panel indicated that jail time was only marginally relevant. Here we have Mario Rieda, who the government agreed to cut his sentence by 50 percent. And what's important, the reason it's more important than marginally relevant is because 50 percent of what? That's why we need the price. Thank you. Thank you. I just want to apologize. The government counsel is correct that in the cross-examination of Rieda, there was some discussion about getting 50 percent off the bottom of the guidelines. I think I misstated that during my argument. In terms of the three-point enhancement for a role, the government has said that he had some organization, Mr. Arnau. First of all, I think the case law requires some organizational authority over other people. But even if you just took the government's view that he had to organize other people, he didn't do that here. What the evidence is is that Wachholz came with him to Rieda. He introduced him. That's all he did. They discussed Wachholz and Rieda, the price and the quantities themselves. And then later on, he acted as a go-between. He took money from one person and got the drugs from the other and gave it. There's no organization. The other people were the ones who organized the whole scheme. He just interacted as an intermediary. Thank you. Thank you for your remarks. I believe that when you review the record, you will believe, as I do, that Ben McChesney was merely a purchaser of some methamphetamine from Spencer, and then he, in turn, sold it to make a little bit of money. And as far as whether Spencer fronted or whether Ben McChesney owed Spencer any money involving drugs, Spencer testified that McChesney owed him $600. Ben testified that it was money he borrowed from him to pay his rent. I believe if you review the record, you'll find that to be true, and that he was merely a buyer of the object of the conspiracy that ended long before he got involved. Your Honor, the Pinkerton challenge that I've advanced here has never been addressed by any panel of any court at any time, ever. The allegation that it's a common law crime, therefore unconstitutional, has actually never been addressed. The issue of whether that foreseeability instruction will withstand it, thus I ask you to do it for the first time. You won't be overruling any other precedent. None is set on that issue. As for the government's recent argument, they ignore and have gotten away with it so far that this was never a trafficking case but a possession case. The issue is possession. Every single case they cite in their brief in support of the idea that these facts support a conspiracy. They support a conspiracy to distribute, perhaps, but not a conspiracy to possess. Thanks. How can you distribute what you don't possess? I mean, it's not so simple when you get methamphetamine. Maybe it's simple when you have something which doesn't have any substance. The issue is can you conspire to distribute something that you don't possess? And the answer is, of course, you can. I can join a league to support the distribution of cattle throughout the state of Montana, market it, traffic it, do everything, and never own or touch a cow but aid or abet that distribution. But in terms of helping ranchers possess cattle for further distribution, you've got to be you've got to have it in your hands or you've got to help in the possession. And they are two distinct philosophical differences, and the government just rolls right over the top of them. In regard to the waiver issue concerning Mr. Kinn's father, the language in Mr. Kinn's father's plea agreement is the identical language that's in the Spielman plea agreement. Spielman is also from Montana, and there was not any inquiry outside that plea agreement when they determined that Mr. Spielman or the defendant in that case had not waived their right to appeal by that language. And we would simply ask the court to follow the previous decision in Spielman. Is that Spielman one also with Judge Stiebel? I don't remember, Judge. I thought it was the same judge, too. I believe it is, but I couldn't. I know it's Marsha Heard, but it's the same language that's in many of our plea agreements. Thank you very much. Okay. Well, I think that covers it. It's a very challenging case and many issues. And again, we appreciate your travel to aid us in examining the issues. The United States v. Arnell.
judges: Canby, Gould, Bea